**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| AMBER GRAHAM,<br><br>Plaintiff,<br><br>v.<br><br>UNITED AIRLINES, INC.,<br><br>Defendant. | No. 25 CV 15141<br><br>Judge Georgia N. Alexakis |

**MEMORANDUM OPINION AND ORDER**

Amber Graham worked for United Airlines for 19 years. But that relationship came to an acrimonious end during the COVID-19 pandemic when United fired her for failing to get the COVID-19 vaccine. Graham says getting the vaccine conflicts with her Christian faith and that United should have accommodated her religious beliefs by exempting her from its vaccine mandate. She sued United under Title VII of the Civil Rights Act of 1964 for religious discrimination and retaliation. United now moves to dismiss Graham's complaint. For the following reasons, United's motion is granted in part and denied in part.

## I. Legal Standards

A complaint must contain "a short and plain statement" showing that the plaintiff is entitled to relief. Fed. R. Civ. P. 8(a)(2). A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). To survive a Rule 12(b)(6) motion, the complaint must allege facts sufficient to state a facially plausible claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is

facially plausible if the complaint's "factual content … allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

When testing the complaint's sufficiency, the Court assumes that the facts alleged in the operative complaint are true and draws all reasonable inferences from those facts in the plaintiff's favor (as it does in the section that immediately follows). *See Tobey v. Chibucos*, 890 F.3d 634, 645 (7th Cir. 2018). But it need not assume the truth of "allegations in the form of legal conclusions." *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 885 (7th Cir. 2012). And "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## II. Facts

Amber Graham worked for 19 years as a customer service gate agent for United Airlines. [22] ¶ 4. When the COVID-19 pandemic caused a substantial drop in air travel in March 2020, working hours for United employees like Graham became scarce. *See id.* ¶ 18. Graham was an hourly employee, so the drop in working hours to a mere 10 to 15 per week meant that she struggled financially. *Id.* ¶ 19.

United offered Graham an early retirement package that included full benefits for 18 months until she reached her full 20-year term. *Id.* ¶ 20. But Graham wanted to keep working, so she declined the offer. *Id.* ¶ 21. Instead, she requested a transfer from Houston's George Bush Intercontinental Airport, where she had been working, *id.* ¶ 15, to Southwest Florida International Airport in Fort Myers, Florida, a more

active location that offered full-service hours, *id.* ¶ 21. United granted her request in March 2021. *Id.* ¶ 22.

In August 2021, United announced that it would require all its U.S.-based employees to receive the COVID-19 vaccine by September 27, 2021. *Id.* ¶¶ 25, 26. Employees could seek an exemption as a reasonable religious or medical accommodation. *Id.* ¶¶ 25, 31–32. But United's CEO warned that not many exemptions would be granted and stated that any employee who "all the sudden decid[ed], 'I'm really religious'" would be "putting [her] job on the line." *Id.* ¶ 29. Employees without an exemption would be fired if they did not provide proof of vaccination by the deadline. *Id.* ¶ 25.

To obtain an exemption, an employee had to request an accommodation by August 31 using an online system called "Help Hub." *Id.* ¶¶ 31, 33. Such a request would trigger the start of an interactive process, the purpose of which was to determine whether United could provide a reasonable accommodation that would not create an undue hardship for the airline or pose a direct threat to the health and safety of others in the workplace. *Id.* at 36.[1] Although United notified employees that it might require additional information during the process, *id.* at 35–36, the Help Hub did not alert employees when additional information was requested, *id.* ¶ 37.

[1] Pages 35–36, Exhibit A to the First Amended Complaint, [22], purports to be a copy of United's vaccination policy. The Court may consider this document, as well as Exhibits B through I, as they are central to and attached to the complaint. *See Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

Graham sought an exemption. She holds pro-life views, which she attributes to her Christian faith, and believes that receiving the COVID-19 vaccine is inconsistent with those views. *Id.* ¶¶ 39–44. Accordingly, she requested a religious accommodation via Help Hub on August 18. *Id.* ¶ 45. In her request, she specifically described the religious nature of her pro-life beliefs, citing two passages from the Bible in support. *Id.*

Graham's request proved insufficient. On Friday, September 3, 2021, at 6:42 p.m.—the Friday before Labor Day weekend—a United representative, Karen Mahecha, notified Graham via Help Hub that Graham had to submit additional documentation "within the next 3 days." *Id.* ¶¶ 51–52. Specifically, she had to provide third-party documentation from someone she knew personally who was aware of Graham's sincerely held religious beliefs. *Id.* In the same Help Hub message thread, another United representative asked Graham about her vaccination history and whether she used Tylenol or had used it in the past. *Id.* ¶ 51; *id.* at 43.

Unsure whether "3 days" meant three business days or three calendar days, Graham responded over the weekend by answering the additional questions and providing a "supplemental statement" in support of her request. *Id.* ¶ 52. The supplemental statement was not from a third party; to the contrary, it was substantially the same as the personal statement she provided with her initial request. *Compare id.* at 41 *with id.* at 45. That is because Graham, who is unmarried, was unable to find anyone outside her home who could write and deliver a statement within three calendar days. *Id.* ¶ 53. Even so, Graham tried to access Help Hub after

Labor Day to submit a third-party letter, but the system did not allow her to do so. *Id.* ¶ 57. She asked her supervisor and others in supervisory roles how she could submit the third-party documentation, but they provided no guidance. *Id.* ¶ 58.

On September 25, United informed Graham that it had administratively closed her accommodation request "[a]s a result of [her] decision not to further participate in the [reasonable-accommodation process]," a decision that United inferred from the fact that it "did not receive any additional information" from Graham after requesting third-party documentation. *Id.* ¶ 60; *id.* at 47. Around the same time, Graham learned that most of the accommodation applicants at the Fort Myers location had received notice of approval the previous week. *Id.* ¶¶ 59, 63.

On September 27, Graham called the United Help Hub Desk. *Id.* ¶ 64. A United representative confirmed that her accommodation request had been closed and stated that he could not reopen the Help Hub portal, did not know how else she could deliver the third-party documentation to the appropriate department, and did not know of anyone else who could help. *Id.* On the same day, Graham reached out to her union representative, who promised to contact United's human resources department for more information. *Id.* ¶ 65. The union representative finally responded on October 12 in a group text to Graham and other Fort Myers accommodation applicants. *Id.* ¶ 66. He explained that United would create new customer service positions at a "Virtual Help Desk" for those with accommodations but provided no information on Graham's closed accommodation request. *Id.*

On October 14, Graham spoke with her supervisor about her accommodation request. *Id.* ¶ 67. Her supervisor directed her to contact the regional human resources representative, Diana Stanley. *Id.* Stanley said she had "no information" about the reasonable accommodation process and was unable to refer Graham to anyone else. *Id.*

Unsure how to proceed, Graham submitted a request to be reassigned to the Dallas Fort Worth International Airport, one of the locations offering the Virtual Help Desk accommodation. *Id.* ¶ 68. Her request was approved on October 16, and she was set to start this new role on November 7. *Id.* But on October 26, a supervisor at the Fort Myers location informed Graham that, because she didn't have an approved vaccine exemption, she was supposed to be on unpaid leave and could not transfer. *Id.* ¶ 69. The next day, United placed Graham on paid leave until an administrative termination hearing scheduled for November 3. *Id.* ¶ 70.

At the hearing, the only issue was whether Graham had received the COVID-19 vaccine. *Id.* ¶ 71. Graham reaffirmed her religious objection to the vaccine, and United confirmed its termination of Graham. *Id.* ¶ 72. United entertained no other topics at the hearing—not the reasons for the closure of Graham's accommodation request, whether United would consider any additional materials (including Graham's third-party documentation), or whether there was any process for reconsideration or appeal. *Id.* ¶ 73.

On November 8, United issued Graham a notice of termination. *Id.* ¶ 74. According to the notice, Graham was terminated for violating United's COVID-19

vaccination policy by failing to "upload [her] complete vaccination record" by the airline's deadline. *Id.* at 49. (The termination notice provided two different dates for this deadline: September 27, 2021, and October 26, 2021. *Id.* at 49–50.) On November 23, United held a second administrative termination hearing, this time with Stanley (the aforementioned human resources representative) and Graham's union representative. *Id.* ¶ 75. At the second hearing, United confirmed that the termination was due to Graham's failure to submit a vaccination record by the deadline and that the decision was final. *Id.*

Graham sued United on December 12, 2025. [1]. In her first amended complaint, Graham brings religious discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17. *See* [22] ¶¶ 103–24. United moves to dismiss both claims for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). [26].

## III. Analysis

### A. Religious Discrimination

Title VII prohibits an employer from "mak[ing] an applicant's religious practice … a factor in employment decisions." *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 773 (2015). That means that an employer violates Title VII when an "applicant … requires an accommodation of [a] religious practice, and the employer's desire to avoid the prospective accommodation is a motivating factor in his decision." *Id.* at 773–74. "A plaintiff claiming that her employer failed to accommodate her religion must as a threshold matter show that (1) the observance, practice, or belief conflicting with an employment requirement is religious in nature; (2) the employee

called the religious observance, practice, or belief to the employer's attention; and (3) the religious observance, practice, or belief was the basis for the employee's discriminatory treatment." *Bube v. Aspirus Hospital, Inc.*, 108 F.4th 1017, 1019 (7th Cir. 2024).

United believes that Graham has not plausibly alleged the third element. Specifically, it argues that Graham's religious beliefs were not the basis for her termination because United denied her exemption request, which ultimately led to her termination, "solely due to her failure to meet a neutral documentation deadline and not because of any discriminatory motive." *See* [27] at 6. The Court does not agree. When considering whether "the religious observance, practice, or belief was the basis for the employee's discriminatory treatment," *Bube*, 108 F.4th at 1019, the question is whether United's "desire to avoid the prospective accommodation [was] a motivating factor in [United's] decision," *Abercrombie*, 575 U.S. at 773.

Here, although United's decision to deny Graham's accommodation request may have been due to Graham's failure to meet a documentation deadline, there are allegations suggesting that the manner in which it imposed and applied the documentation deadline on Graham was motivated by a desire to avoid granting her an exemption to the COVID-19 vaccination policy. First, United's CEO publicly stated that "not many exemptions would be granted" and warned that employees who requested a religious accommodation to the policy risked termination. [22] ¶ 29. Then, when United informed Graham that it needed third-party documentation, it did so after the close of business on the Friday before a holiday weekend. *Id.* ¶ 51–52.

In addition, it imposed a tight three-day deadline without clarifying whether the three-day window comprised three calendar days—all three of which would fall within the holiday weekend—or three business days. *Id.* ¶ 52. When Graham tried to submit the required documentation through United's Help Hub after the holiday weekend, the system wouldn't allow her to. *Id.* ¶ 57. And when she sought help, she was stonewalled at every turn—by her supervisor, by others in supervisory roles, by a representative at United's Help Hub Desk, by her union representative, and by United's regional human resources representative. *Id.* ¶¶ 58, 64, 65–67.

Together, these allegations tell a plausible story of a company imposing and applying an unreasonable documentation deadline out of a "desire to avoid" granting an exemption to its vaccination policy. *Abercrombie*, 575 U.S. at 773. That story holds even if United approved more than half of the accommodation applicants at its Fort Myers location. [22] ¶ 63. After drawing all reasonable inferences in Graham's favor, *see Tobey*, 890 F.3d at 645, the fact that United approved other accommodation requests does not change Graham's allegations, taken as true, about the circumstances leading up to the denial of her accommodation request. Graham has thus plausibly plead that her religious belief "was the basis for" her termination. *Bube*, 108 F.4th at 1019.

This conclusion is not undermined by *Anderson v. United Airlines, Inc.*, No. 23 C 989, 2023 WL 5721594 (N.D. Ill. Sep. 5, 2023), even assuming this decision were binding on this Court. In that case, United denied a plaintiff's failure-to-accommodate claim because he had requested the accommodation after the initial deadline. *Id.* at

*5. The court reasoned that the plaintiff "d[id] not provide any factual detail … to support his conclusory allegation that the specific deadline he missed was arbitrary." *Id.* The court went further, noting that "it is not reasonable to infer that United's simple imposition of a deadline was arbitrary or discriminatory," since United had been "[f]aced with the global COVID-19 pandemic." *Id.* The complaint in another case United relies upon, *Bement v. United Airlines, Inc.*, had the same problem. No. 24 C 9201, 2025 WL 1294641, at *1 (N.D. Ill. May 5, 2025) ("Nor does Bement plausibly allege that United's setting of a deadline was arbitrary."). Here, in contrast to both *Anderson* and *Bement*, Graham submitted her accommodation request before the initial deadline. [22] ¶ 45. And there are factual allegations supporting Graham's contention that United's three-day additional-documentation deadline was "unnecessary, logistically impractical, [and] unduly burdensome," intended to "set[] [Graham] up for failure." *Id.* ¶¶ 54–55.

United argues that the statements of its CEO are irrelevant absent allegations that he "played any role in reviewing or denying [Graham's] request." [32] at 9. But, as a CEO is generally tasked with setting the agenda for the company she leads, it is perfectly reasonable to infer that the statements reflect United's approach to religious accommodation requests like Graham's. They therefore bear on United's motive for asking Graham for third-party documentation within a three-day holiday-weekend period.

The two cases United cites do not persuade otherwise. In *Pillows v. Cook County Recorder of Deeds Office*, the plaintiff alleged that she was terminated

because of her political affiliation. No. 18 C 7497, 2019 WL 2524149, at *3 (N.D. Ill. June 18, 2019). The court held that statements made four years before the plaintiff was laid off by a person with no authority over the plaintiff had no bearing on her claim. *Id.* *4. In *Tate v. Ancell*, the plaintiff alleged that he was suspended in retaliation for supporting a charge of sexual harassment. 551 Fed. App'x 877, 887 (7th Cir. 2014). The court held that statements made two years before the alleged suspension, by a person who had retired around the time he made them, were irrelevant. *Id.* at 888. But, here, Graham alleges that United's CEO made his statements mere weeks before United imposed the three-day third-party-documentation deadline, a drop in the bucket compared to the multi-year delays in *Pillows* and *Tate*. [22] ¶ 29. Plus, unlike the speakers in *Pillows* and *Tate*, it is reasonable to infer that United's CEO had decision-making authority over the airline's vaccination policy and the nature of its implementation, even if he didn't directly impose the specific deadline that stymied Graham's accommodation request.

Graham's religious discrimination claim may therefore proceed.

### B. Retaliation

Graham's retaliation claim does not fare as well. "To sufficiently plead a retaliation claim under Title VII, a plaintiff must plausibly allege that '(1) he engaged in an activity protected by the statute; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action.'" *Leffler v. Ann & Robert H. Lurie Child.'s Hosp. of Chi.*, No. 22 C 401, 2023 WL 6461365, at *6 (N.D. Ill. Oct. 4, 2023) (quoting *Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 911 (7th Cir. 2022)).

Graham does not plausibly allege that she engaged in any protected activity. Title VII protects employees against retaliation for opposing a discriminatory act; making a charge of discrimination; or participating in a Title VII investigation, proceeding, or hearing. 42 U.S.C. 2000e-3(a). Applying for a religious accommodation—or asking about the status of the application—is not on its own a protected activity. *See Hertog v. 1002 Sister Barbara Way Prop., LLC*, No. 4:24-CV-00093-TWP-KMB, 2025 WL 119077, at *4 (S.D. Ind. Apr. 23, 2025) ("[S]imply requesting a religious accommodation, unaccompanied by anything that can be plausibly interpreted as opposition to an unlawful employment practice, is not protected under Title VII." (quoting *Hunter v. AFGroup Emerging Mkts.*, No. 22-CV-990, 2023 WL 372204, at *3 (E.D. Wis. Jan. 24, 2023)). Here, Graham alleges that she applied for a religious accommodation to United's COVID-19 vaccine mandate, [22] ¶ 45; submitted a letter describing her religiously based, pro-life views and the ways in which receiving the vaccine conflicted with those views, *id.* ¶¶ 45, 52; *id.* at 41, 45; failed to timely provide third-party documentation requested by United, *id.* ¶¶ 53–54; attempted to provide the third-party documentation after the deadline, *id.* ¶¶ 57–58; followed up on the application with various United employees, *id.* ¶¶ 58, 64, 67; and participated in two termination hearings, *id.* ¶¶ 71–74, 75. These are not allegations that can be plausibly interpreted as opposition to a discriminatory act, and Graham cites no binding authority to the contrary. There are no allegations suggesting that United had any way of knowing that Graham's accommodation request, failure to provide timely documentation, or inquiries about the status of her

application had the purpose of opposing a discriminatory practice. *See Hertog*, 2025 WL 119077, at *4; *cf. also Tomanovich v. City of Indianapolis*, 457 F.3d 656, 669 (7th Cir. 2006) ("[I]f an employer did not know the plaintiff made any complaints, it cannot be trying to penalize him for making them."). The Court need not consider Graham's conclusory allegation that she "has articulated that her accommodation requests were not merely exercising her Title VII rights, but also in opposition to the discriminatory practices that United connected to the religious-exemption process." [22] ¶ 121. *See Iqbal*, 556 U.S. at 686.

Nor has Graham plausibly alleged that there is any causal link between any of her activities and any adverse employment action. The question when determining causation in a retaliation claim is whether the plaintiff would have been better off had they not engaged in a protected activity. *Oka v. Air Line Pilots Ass'n*, No. 23 C 15793, 2024 WL 3888763, at *7 (N.D. Ill. 2024) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)). United said employees who did not receive the COVID-19 vaccine would be terminated unless granted an exemption. *Id.* ¶ 25. Graham did not receive the vaccine, and she was denied a transfer, put on leave pending termination, and ultimately terminated. *Id.* ¶ 69–70, 75. The same things would have happened if Graham had simply failed to get the COVID-19 vaccine but never requested an accommodation—at least, nothing in the complaint suggests otherwise.[2] That Graham was denied a transfer, placed on leave, and terminated all

[2] The Court does not consider causation with respect to the accommodation itself, as "a defendant's failure to reasonably accommodate does not constitute an adverse action enabling a plaintiff to maintain a retaliation claim." *Oka*, 2024 WL 3888763, at *7.

within three months of her accommodation request is not on its own sufficient to show causation. *See Moore-Fotso v. Bd. of Educ.*, 211 F. Supp. 3d 1012, 1038 (N.D. Ill. 2016).

Graham's retaliation claim is therefore dismissed.

## IV. Conclusion

For the foregoing reasons, the Court grants in part and denies in part United's motion to dismiss. [26]. Count I may proceed. Count II is dismissed without prejudice. *See Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519–20 (7th Cir. 2015). Graham may seek leave to amend Count II of her first amended complaint by 11/13/2026; if she fails to do so, the dismissal of Count II will automatically convert to a dismissal with prejudice.

The Court refers this matter to the assigned Magistrate Judge for purposes of discovery scheduling and supervision and to conduct a settlement conference, as necessary. This Court will set any schedule on summary judgment briefs following the completion of discovery and an in-chambers summary judgment conference.

ENTER:

Georgia N. Alexakis
United States District Judge

Date: 9/21/2026